SALLEE et al., Appellants, v. McMURRY, Respondent.

St. Louis Court of Appeals, June 1, 1905.

1. **REAL ESTATE BROKER: Procuring Purchaser.** A real estate broker earns his commission when he produces and introduces to his principal a buyer who is able, ready and willing to buy upon the terms at which the broker is authorized to sell.

2. ———: ———: **Refusing to Sell.** And where the owner refuses to sell after the broker has produced to him a buyer who is able, ready and willing to buy upon the terms proposed, the law regards the sale as made, in so far as to entitle the agent to his commission.

3. ———: **Procuring Cause.** The real estate broker is entitled to his commission if he is the procuring cause of the negotiations which result in a sale, that is, if he brings the parties together for the purpose of negotiating and negotiations are afterwards concluded by the principal in person.

4. ———: **Procuring Purchaser: Terms of Sale.** Where the principal, on the production of a purchaser for his real estate by the broker in whose hands it is placed, fixes or varies the terms, he is liable for the commission, though he fails to carry out his contract and convey according to the modified terms agreed upon with the buyer.

5. ———: **Limit of Employment: Reasonable Time.** Where one employs a real estate broker as agent to sell his land, the broker, in the absence of a time limit to his employment, is entitled to a reasonable time in which to find a purchaser; in determining what is a reasonable time, the facts and circumstances of each case should be considered.

6. ———: **Revoking Agency.** The agency of a real estate broker, where no time for its continuance is fixed, may be terminated by either party at will, if done in good faith and upon reasonable notice.

7. ———: ———. But the principal can not terminate the agency of a real estate broker employed by him, pending negotiations for the sale of his land, brought about by the broker, and thus defeat the broker's compensation.

8. **PRACTICE: Instruction: Assuming Fact.** An instruction to the jury which assumes the existence of a fact not in proof is error.

Appeal from Scotland Circuit Court.—*Hon. E. R. McKee,* Judge.

REVERSED AND REMANDED.

*C. H. Hilbert* and *Smoot, Boyd & Smoot* for appellants.

(1) A real estate broker's commission is due when he produces a purchaser who is ready, able and willing to buy, and who offers to comply with the terms imposed by the landowner. Chipley v. Leathe, 60 Mo. App. 20; Hayden v. Grillo, 35 Mo. App. 647. And this is true if the broker brings vendor and vendee together and places them in a position that they may execute a contract. Gelatt v. Ridge, 117 Mo. 553, 23 S. W. 882. Nor is the right to the commission impaired by the default of the principal—by the landowner refusing to perfect the sale where the terms imposed by him have been accepted. Reeves v. Vette, 62 Mo. App. 440; Harwood v. Diener, 41 Mo. App. 49. (2) While the contract remains executory and the land is yet unsold, the owner may rescind the contract of agency; but if he claims the

right of rescission he must give notice before there is a performance. ·Gaty v. Sack, 19 Mo. App. 478; Jones v. Berry, 37 Mo. App. 131. And until the termination of the agency, either by sale or some act of the employer, the agent's authority to make the sale continues—the agency is a continuous one for a reasonable time or until terminated. Leslie v. Boyd, 124 Ind. 320, 24 N. E. 887; 9 Cyc. 613; 1 Am. & Eng. Ency. Law (2 Ed.), 1220; 44 L. R. A. 608 (note on time of performance). What may be a "reasonable time" depends on the facts in each particular case and is a question of fact for the jury. Howe v. Bristow, 65 Mo. App. 624; it is a relative term and its meaning depends wholly on the attendant circumstances. Bryant v. Saling, 4 Mo. 522; 19 Am. & Eng. Ency. Law (1 Ed.), 1089, and notes; 9 Cyc. 611, 613. In land broker's contracts "reasonable time" is liberally construed, and three years may be a reasonable time. Green v. Wright, 36 Mo. App. 305. This is true because the employer has the right to revoke the agency by notice any time before a purchaser has been secured. Gaty v. Foster, 18 Mo. App. 643. (3) The very essence of a brokerage contract is that reward is conditioned on success, and not on the amount of work done by the broker. If he fails the time and labor are lost; if he succeeds the reward is won. Sibbald v. Iron Co., 83 N. Y. 378, 38 Am. Rep. 441. (4) The principal or landowner cannot hold forth a reward to stimulate the agent's labors and when success is achieved, terminate the agency and appropriate to himself the benefit of the agent's labors. Mfg. Co. v. Holbrook, 118 N. Y. 586, 23 N. E. 908; Extract Co. v. Grocer Co., 90 Mo. App. 53. A landowner has no right, when in the midst of negotiations instituted by the agent, and which are plainly tending and evidently approaching success, to revoke the authority of the agent; for then the completion of the contract is plainly prevented by the landowner. And the broker has earned his commissions. Fitzpatrick v. Gilson, 176 Mass. 477, 57 N. E. 1000; Washburn v. Brad-

ley, 169 Mass. 86, 47 N. E. 512. Nor can the landowner at the last minute change his mind and say, "I will make no sale," and thus deprive the agent of the reward conditioned on achievement. Holden v. Starks, 159 Mass. 503, 34 N. E. 1069; Cadrigan v. Crabtree, 179 Mass. 474, 55 L. R. A. 77 (especially note brief on this case in L. R. A.); Glover v. Henderson, 120 Mo. 367, 25 S. W. 175.

### STATEMENT.

From a careful reading of the record in this case, we become impressed at once that the verdict is for the wrong party.

The suit is that of real estate brokers for their commissions. The principal facts are detailed in evidence substantially the same by both plaintiffs and defendant. They are as follows:

The defendant owned a farm of 267.40 acres, not far from Rutledge, in Scotland county. Some time in the summer or fall of 1901, he agreed verbally with plaintiff, Sallee, who was a liveryman, that if Sallee would procure for him a buyer for said farm at a price of $40 per acre, he would pay five per cent commission on the purchase price. About the first of the following June, 1902, Sallee interested his coplaintiff, Ferris, in the matter and proposed that if Ferris, who had recently moved to Scotland county from Rock Falls, Illinois, would assist him in procuring a buyer from among some of his former Illinois neighbors or elsewhere, for said farm, that he would divide the commission on the sale. Ferris assented thereto, and a few days later brought to Sallee a Mr. Jamison, of Rock Falls, Illinois, a prospective buyer. This was on Saturday. Sallee called up the defendant over the telephone, who was then at his farm, and reminded him of their verbal contract or conversation had the fall before with regard to the sale of the land and asked him if he still desired to sell. His answer was to the effect that he guessed so. Sallee then told him that he

would bring some men out to see the land the next day. Defendant answered that he would be at home. On Sunday morning, Sallee, his coplaintiff, Ferris, Mr. Jamison, the prospective buyer, and Mr. Hiens, also of Rock Falls, Illinois, a former neighbor of Jamison and Ferris, drove to the defendant's farm where defendant met them and showed them around the place. While they were out on the farm, defendant and plaintiff Sallee separated themselves for a few moments from the remainder of the party, whereupon the following conversation between plaintiff and defendant, as testified to by defendant, took place: "He asked me then, 'Don't you remember the conversation we had last fall at Rutledge?' 'What was the conversation?' I asked. 'You would give me five per cent to bring you a buyer at $40 an acre.' And I told him I remembered it. We had gotten down within probably thirty steps of the men and he says, ' Don't mention this before these fellows, I ain't known to them only as a liveryman,' and I says, 'All right.' " Upon further examination of the farm, Mr. Jamison, the prospective buyer, was informed that defendant's brother, Joseph McMurry, owned the adjoining farm of 267.40 acres and that he might possibly be induced to sell. This interested Jamison very much as he wanted a farm about the size of these two. He had in the neighborhood of $25,000 in cash which he desired to invest in lands. The party then went to Joseph McMurry's house. He not being at home, then decided to return to Rutledge and communicate with him the following day. On Monday morning, Sallee called Joseph McMurry over the telephone. He said he would sell his farm. Thereupon the party drove a second time to the defendant's place and found defendant plowing corn in his field. They examined both his farm and that of his brother, Joseph, and Mr. Jamison practically concluded to take the farm, but he desired to go down into Carroll county with Mr. Heins and look a little further.

113 app—17

He and the McMurry's agreed, however, that if he returned by the fourth day of July, he could have the farm of each at $40 per acre. A payment of $500 cash was to be made at the time of his return and the remainder to be paid the first of the following March, at which time he was to have possession. The McMurry's reserved the right, however, to sell the land to any other buyer that might come along in the meantime, but if it was not sold, Jamison might have it upon the terms stated, at any time prior to July 4th. About June 25 Joseph McMurry, with whom the plaintiffs had no contract, and who is not a party to this suit, decided not to sell his lands and so telegraphed Jamison. On that date, in the town of Rutledge, defendant and plaintiff, Sallee, had a conversation in which the defendant sought to wriggle out of his commission contract, to which conversation defendant testified as follows: "Then Sallee says, 'Don't you remember the first conversation I asked you last fall if you wouldn't give me five per cent if I would bring you a buyer at $40?' and I told him I did remember of the conversation. 'Well,' he says, 'Now you are backing out of the trade.' I says, 'I won't bind myself to sell it at $40.'" And further on he explains as follows: "I told him I would not bind myself to sell it at $40; that the old man had insisted that the odd $100 be knocked off to make it an even price of $21,000 on both places and that if I had to do that, if I should give them a contract of five per cent commission and make a trade with the old man and knocked that off, would they be willing to take $444 out of the five per cent, and they said they wouldn't." That Sallee advised him to stand pat at $40, not knock off anything, and that old man Jamison would take the land at that price. On June 28 and 30, Mr. Jamison returned from Illinois to consummate the deal for the land. He, and plaintiffs, Sallee and Ferris, drove to defendant's farm where they met defendant and his brother Joseph. Mr. Jamison informed them that he had come to take the land and make payment

thereon. Joseph McMurry told him he had concluded
not to sell. He and Jamison had some conversation and
the matter was dropped so far as Joseph McMurry's
farm was concerned. Defendant testified that he then
asked Mr. Jamison if he wanted his farm without that
of his brother, to which Mr. Jamison answered that he
did not; that he wanted both or none at all. Whereupon
defendant claims he said to Jamison: "This ends the
matter between you and me then." This conversation is
alleged to have occurred at his woodpile in the presence
of plaintiffs. Both plaintiffs and Jamison say it did not
occur at all. Jamison, however, asked permission to
drive down on his farm and look at the drainage, which
was granted, and defendant here testified that he said:
"You may go and look for information but not to buy."
Both plaintiffs and Jamison say no such remark was
made and defendant's hired hand, who was present, did
not hear it. Thereupon Jamison, the two plaintiffs and
Joseph McMurry drove down and looked at the bottom
lands. While looking at the bottom lands and driving
back to the woodpile where defendant was at work, Sal-
lee and Ferris persuaded Jamison that he could take de-
fendant's farm at the agreed price as an investment and
make some money out of it. Jamison concluded that it
was the better piece of land of the two farms and that
he would take it. They returned to the woodpile and
notified defendant that Mr. Jamison had concluded to
take his farm at the agreed price and Mr. Jamison took
from his pocket a bank draft for $1,000, saying that he
was to pay only $500 on the one farm, but as the brother
had backed out, he would pay the entire amount on this
farm. The defendant took the draft and looked at it,
saying he supposed it was all right, but that he would
not sell his farm. Thereupon Sallee, the agent, called
his attention to the several conversations whereby he
was to have five per cent commission for producing a
buyer, which conversation defendant admitted, but
said: "You are not a real estate man, you are a livery-

man and I will not pay you any commissions," and refused to pay commissions on the sale. Defendant testified to the following conversation which occurred between himself and plaintiff, Ferris, just prior to Jamison driving down on the bottom to look at the drainage: "Mr. Ferris says, 'You remember the conversation you had with Mr. Sallee last fall, and you remember you said you would not raise the price on Mr. Jamison before the fourth day of July. Now you refuse to sell.' I told him I did not refuse to sell." So we see up to this time there was no refusal to sell, according to defendant's testimony. Defendant then testified that as the party went to leave him, he opened the gate, and as they drove off, "Tom Sallee says, 'I have produced a buyer.' I says: 'You might not understand it and made it as plain as I could when you left here before (meaning when they parted to drive on the bottom and look at the drainage) that you could not look at this place to buy,' and says, 'if you did not understand it then, I want you to understand it distinctly that if you ever have had authority to sell this farm to anyone or to price it to anybody, you never shall have authority to.' He says, 'Now you withdraw it?' I says, 'Yes.' The old man says: 'I understand it.' I says: 'Some people have got pretty thick heads that you can't beat anything into them.'" All of the evidence shows that Mr. Jamison had at the time, $18,000 in the bank on deposit and was ready, able and willing to buy this farm and was prevented from doing so by a flat refusal of the defendant to sell.

Defendant's contentions are that while he agreed to pay Sallee a commission in a conversation had the summer before, that the contract had expired and that it had never been renewed by him. He was therefore not obligated to pay; and second, that he revoked the authority of the agent by his statement to Mr. Jamison in the presence of the agent upon Jamison saying to him that he did not want one farm without

the other: "That settles it, Mr. Jamison, between you and me. That is what I wanted to know," and that by saying to Jamison and the others that they might look at the farm for information but not to buy when Jamison drove to the bottom to look at the drainage, which statements plaintiffs and Jamison say he did not make.

The court instructed the jury on the part of the plaintiff that if the jury believed from the evidence that defendant contracted to pay plaintiff five per cent commissions for producing a buyer for his farm at $40 per acre, and that plaintiffs produced a buyer before said authority was revoked by defendant McMurry and within a reasonable time, while said contract was still in force, and such buyer was ready, able and willing to buy, and that defendant refused to sell, then the finding should be for the plaintiff. The court refused the following instructions asked by plaintiff, to the refusal of which exceptions were saved and complaint thereof is made here.

"7. Gentlemen, if you find from the evidence in this cause that the defendant contracted and agreed with the plaintiff Sallee that if he would sell his farm at $40 per acre he would give him a commission of five per cent on the amount of the sale; and if you believe that said Sallee did so furnish a purchaser ready, able and willing to take said land at said price then it was not necessary that said Sallee should negotiate the terms of said sale; it was sufficient that he produce a man who was able and willing to comply with the terms that the defendant imposed; and if you find that he absolutely refused to make the sale, then said Sallee was entitled to his commission and your findings should be for the plaintiffs.

"8. Gentlemen, if you believe from the evidence in this cause that the defendant, McMurry, contracted and agreed with the plaintiff, Sallee, that if he would sell his land for the price and sum of $40 per acre he would pay to him the sum of 5 per cent commission

on the total amount of the sale, and if you further believe that the plaintiff, Sallee, produced to him a purchaser or was the cause of one being produced who was ready, able and willing to take the land at said price, but the defendant, McMurry, refused to perfect said sale, and if you further believe that this coplaintiff is the one-half owner of the said commission then you should find for the plaintiffs, as though said sale had been made the full amount of said 5 per cent commission on said purchase price.

"9. It was not necessary, gentlemen, that the plaintiff, Sallee, should have negotiated the terms of said sale with the purchaser, nor need he actually produce the purchaser in person, if he was the procuring cause of the purchaser being produced to the defendant, and if you believe the purchaser so produced was able and willing to take the land and pay for it at the price and sum of $40.00 per acre, then said Sallee was entitled to commission provided defendant contracted with him as set forth in above instructions."

There was some evidence on the part of the defendant to the effect that one Murray first told Jamison of defendant's farm and that he was thinking of going to see it when taken in charge by the plaintiffs and negotiations commenced by them. The above instructions 8 and 9, were predicated upon this evidence, and they, as well as No. 7, should have been given.

The following instruction, numbered 10, refused, should have been given:

"10. Gentlemen, if you believe from the evidence in the cause that the defendant, McMurry, employed the plaintiff, Sallee, to sell his farm for him and agreed with him if he would sell it for $40 per acre he would give him a commission of five per cent on the total amount of the sale, then said Sallee would have been entitled to reasonable notice taken into consideration the condition and situation of the parties, of the revocation of said agency, and it would be too late for the de-

fendant, McMurry, to revoke it, or terminate it after the negotiations with the purchaser had begun, which were finally consummated, if you so believe they were."

It was error to give defendant's instructions, numbers 11 and 12, as follows:

"11. The jury are instructed that even though they may believe from the evidence in the cause that defendant McMurry agreed with plaintiff Sallee to pay him 5 per cent commission for producing a purchaser for his farm, and even though you shall further believe that while said contract was existing said Sallee produced witness Jamison who was able to purchase and pay for said farm, still if you shall further believe from the evidence that said Jamison told the defendant that he would not take his farm without the farm of the other brother went with it, and that thereupon the defendant informed Jamison and the plaintiffs, or either of them, in the presence of the others that the trade was off between them, and that the farm was not for sale, then your verdict should be for the defendant, even though you may believe that within a short time said Jamison returned and offered to take the farm.

"12. The jury is instructed that if you shall believe from the evidence in the cause that on the 30th day of June, 1902, at the woodpile, Jamison informed the defendant that he would not purchase his farm without also getting Joe's farm, and left with that understanding between himself and the defendant, then Jamison and the plaintiffs were bound by such understanding, and he would have no right to return and offer to take defendant's farm for the mere purpose of collecting commissions off the defendant."

These two instructions treated the matter of Jamison's stating that he did not want one of the farms without the other, as having terminated the agency to sell the lands, and for this reason are erroneous.

The trial resulted in a verdict for the defendant. Plaintiff appeals here for review.

NORTONI, J. (after stating the facts).—It is the law that a real estate broker earns his commission when he produces and introduces to his principal, a buyer who is able, ready and willing to buy, upon the terms at which the broker is authorized to sell. [Brown v. Smith, 113 Mo. App. 59; Goodson v. Embleton, 106 Mo. App. 77, 80 S. W. 22; Finch v. Trust Co., 92 Mo. App. 263; Finley v. Dyer, 79 Mo. App. 604; Huggins v. Hearne, 74 Mo. App. 86; Chipey v. Leathe, 60 Mo. App. 15; Hayden v. Grillo, 45 Mo. App. 1; s. c., 35 Mo. App. 647; s. c., 26 Mo. App. 289; Gelatt v. Ridge, 117 Mo. 553, 23 S. W. 882.] And in cases where the principal refused to sell upon the broker having produced and introduced to him a buyer who is ready, able and willing to purchase upon the terms proposed, the law regards the sale as made in so far as the agent and his commissions are concerned, upon the theory that the law does not require that to be done by the agent which is either unreasonable or impossible. But having produced a qualified buyer, he has fully performed on his part, as it is not within his power to force the proprietor to convey the land, and in such case, the law declares the commissions earned and the sale made on the part of the broker. [Brown v. Smith, 113 Mo. App. 59; Goodson v. Embleton, 106 Mo. App. 77, 80 S. W. 22; Real Estate Co. v. Ruhlman, 68 Mo. App. 503; Wright & Orison v. Brown, 68 Mo. App. 577; Reeves v. Vette, 62 Mo. App. 440; Hart v. Hopson, 52 Mo. App. 177; Stinde v. Blesch, 42 Mo. App. 578; Hayden v. Grillo, 42 Mo. App. 1; Harwood v. Diemer, 41 Mo. App. 48; Gelatt v. Ridge, 117 Mo. 553, 23 S. W. 882.]

It is also well settled that the agent is entitled to his commissions if he is the procuring cause of the negotiations which resulted in the sale, even though the agent does nothing more than bring the parties together for the purpose of negotiating and the negotiations are afterwards conducted and concluded by the principal in person. [Gelatt v. Ridge, 117 Mo. 553; Timberman

v. Craddock, 70 Mo. 638; Tyler v. Parr, 52 Mo. 249; Bell
v. Kaiser, 50 Mo. 150; Wright & Orison v. Brown, 68
Mo. App. 577; Brennan v. Roach, 47 Mo. App. 290.]

In the case at bar, the contract of employment con-
tained nothing as to the terms upon which the sale was
to be made by Sallee and, of course, in the absence of
such stipulation, the law would presume the terms to
be cash. But be this as it may, the principal can fix the
terms to suit himself upon meeting the purchaser pro-
duced by the broker and can even vary the terms if he
sees fit, that were originally provided between himself
and the broker, and upon doing so, would be obligated
to pay the broker commissions upon his failure thereaf-
ter to carry out the contract in accordance with the
terms agreed upon between himself and the prospective
buyer. [Wright & Orison v. Brown, 68 Mo. App. 577;
Brennan v. Roach, 47 Mo. App. 290; Jones v. Berry,
37 Mo. App. 125; Goff v. Gibson, 18 Mo. App. 1.]

In the case at bar, the brokers produced the pur-
chaser and he and the respondent agreed upon the terms
of purchase, upon which Jamison could have the farm
at any time before the 4th day of July, provided re-
spondent did not sell it to other parties. Jamison re-
turned in due time and offered to take the place in ac-
cordance with the terms theretofore agreed upon and
the sale was defeated by no other cause than the flat re-
fusal of the defendant to convey. Upon this state of
facts, appellants would be entitled to recover their com-
missions if the jury find that they were employed as
they alleged, and of which employment there seems but
little or no doubt, unless the agency had been terminated
before respondent's refusal to consummate the same. If
appellants were employed as agents or brokers for
the sale of the land, as it seems almost beyond contro-
versy they were, then the employment would continue
for a reasonable time at least, or until revoked. In a
contract of employment to sell real estate, the broker is
universally entitled, in the absence of the revocation of

his authority, or a time limit to his employment, to a reasonable time in which to find a purchaser. [Henderson v. Vicent, 84 Ala. 99-100; Biddison v. Johnson, 50 Ill. App. 173; Lane v. Albright, 49 Ind. 275; Stedman v. Richardson, 100 Ky. 79; Carroll v. Petit, 67 Hun. 418; Sibbald v. Iron Co., 83 N. Y. 384; Leslie v. Boyd, 124 Ind. 320; 9 Cyclopedia Law & Proced., 613; 1 Am. & Eng. Ency. Law (2 Ed.), 1220.] "In deciding whether an undertaking has been performed within reasonable time, the material difficulties and hazards attending it and the amount of diligence used and frustrated attempts at performance should be considered, . . . and that it is a question of fact for the jury when it depends upon facts extrinsic to the contract and which are matters in dispute." [9 Cyclopedia Law & Proced., 613.]

In determining what would be a reasonable time for complying with a contract of this kind, it must be kept in mind that farms are slow in selling. Purchasers are not found every day and that the facts and circumstances surrounding the transaction usually are such that some little time is required in which to find a buyer and then work up a sale. In short, the facts and circumstances of each case should be considered in determining what is a reasonable time therein. [Howe v. Bristow, 65 Mo. App. 624.] At any rate, it is in evidence in this case and it seems beyond dispute, as both parties testified substantially the same about the conversation on the evening before the broker drove the purchaser to respondent's farm, Sallee called the attention of respondent to the conversation about the sale of the farm which he had had the fall before. Defendant said he remembered it and upon being told that he would bring some land buyers out the next day, said he would be at home, all of which tends to show that the contract in this case was then being acted upon by both parties, and on the following day on defendant's farm, when Sallee related the conversation of the fall before to respondent, he did not repudiate any part of it. All of the

Sallee v. McMurry.

conversation tends to show that if a contract existed at all, they were then acting upon it. If the contract of agency existed, there is no doubt but what the respondent had the right to terminate it, as where no time for the continuance of a contract of this kind is fixed, either party is at liberty to terminate it at will, subject only to the requirements of good faith and reasonable notice. [Sibbald v. Iron Works, 83 N. Y. 378; Jones v. Berry, 37 Mo. App. 125; Gaty v. Sack, 19 Mo. App. 470.]

The law is well settled, however, by numerous adjudicated cases that the principal will not be permitted to terminate the agency without cause in the very midst of negotiations which the agent has brought about by the expenditure of time, labor or money to which he has been encouraged and moved by the principal. The principal is no more permitted to terminate the agency in the midst of negotiations and thus defeat the agent's compensation by refusing to convey, upon the ground that he has terminated the agency, while the negotiations were pending, under like circumstances and defeat the agent's compensation when he takes the negotiations out of the agent's hands and completes the sale on his own account. The policy of the law is the same in either case; to protect the agent and see that he is compensated for the services he has rendered. It would be highly unjust, indeed, to permit the employment of agents and their encouragement to work and expend money and time in the service of their principals and then permit the principals to defeat them of their expected compensation by terminating the agency when the purchaser was, himself, almost ready to close the bargain. 1 Amer. & Eng. Ency. Law (2 Ed.), 1217, says: "Of course, if the authority has been executed, it cannot then be revoked." And again, at page 1217, says: "The agent cannot be deprived of the fruits of his labors; and when a sale is virtually effected by a duly authorized agent, if the principal takes the matter

into his own hands, he is still liable for the commission to his agent, since the latter is the procuring cause." [Knox v. Parker, 2 Wash. 34; Sibbald v. Iron Co., 83 N. Y. 378; Green v. Cole, 103 Mo. 70, 15 S. W. 317; Glover v. Henderson, 120 Mo. 367, 25 S. W. 175; Blumenthal v. Goodall, 89 Calif. 251; Livezy v. Miller, 61 Md. 336.] In the case last cited, the Supreme Court of Maryland said: "It is also the established law that after negotiations begun through a broker's intervention, having virtually culminated in a sale, the agent cannot be discharged so as to deprive him of his commissions. If the agent is the procuring cause of the sale made, he will be awarded his commissions." In Knox v. Parker, 2 Wash. l. c. 37, the court said: "And if, at the time of the revocation, the agent should have a pending treaty with a proposing purchaser, who afterwards, by a continuance of the same negotiations with the principal himself, actually buys the property, the agent would have fully earned his commission, since the principal in such transaction cannot arbitrarily cut off the agent's authority, in the midst of what would be a successful agency, and then, although himself taking advantage of the agent's services refuse him compensation." The Supreme Court of New York said: "Thus, if in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with a view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might well be said that the due performance of his obligation by the broker was purposely prevented by the principal." [Sibbald v. Iron Co., 83 N. Y. l. c. 384.]

It seems clear to us that the mere fact that the prospective buyer, Jamison, said in the conversation at the woodpile, that he did not want defendant's farm without that of his brother, and that defendant replied to him that, "This ends the matter then between you and me," cannot operate to terminate the agency of the

plaintiffs in this case even though it was said in their presence and they heard it, as such remarks were evievidently only a part of the negotiations. It is an every day occurrence with a prospective buyer when he fully intends to buy, to say that the article does not suit him, that he don't believe he wants it, etc., and such statements cannot be treated in cases of this kind as terminating all negotiations. There was nothing said by the respondent to the appellants which tended to terminate their agency, if they had one, and the remark which the defendant says he made, that they could go down on the bottom and look at the land for information but not to buy, certainly would not operate at that time as a termination of the agency nor as a revocation of authority. Plaintiffs had performed their services and were still working to consummate the deal, and the law would not permit the trade to be called off by the defendant at the last moment, and their commissions defeated thereby. Having produced a purchaser to whom respondent had given every assurance of his willingness to sell, they had the undoubted right and it was their duty to use every effort to induce him to buy, at least as long as he remained upon the premises, even though he had expressed himself as unwilling and upon his finally agreeing to do so, it was respondent's duty to sell.

The twelfth instruction given on behalf of the respondent, was bad for a second reason. It assumes a fact not in proof and tells the jury that: "He would have no right to return and offer to take defendant's farm for the mere purpose of collecting commissions off of defendant." It is palpable that Jamison, the purchaser, could have no commission in the trade. The instruction is therefore suggestive of a conspiracy between the appellants and the purchaser to mulch respondent for commissions of which there was neither evidence nor a fact from which a reasonable inference to that effect could be drawn, in the record. It stands

out in the case as an unwarranted imputation of bad faith and conspiracy on the part of appellants and the purchaser. Instructions of this character should be avoided in cases when not warranted by the evidence. [Beauchamp v. Higgins, 20 Mo. App. 514; Johnson v. Kahn, 97 Mo. App. 628, 71 S. W. 725.]

For the reasons given, the judgment is reversed and the cause remanded to be proceeded with in accordance with the views herein expressed. All concur.